**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | Case No.: 24-cv-6886 |
| Plaintiff, | |
| v. | ECF CASE |
| | COMPLAINT |
| THE PRE IPO MARKETPLACE INC.; KEYPORT VENTURE PARTNERS, LLC; KEYPORT VENTURE MANAGEMENT, LLC; KEYPORT VENTURE ADVISORS, LLC; PRINCIPAL PRE-IPO CONSULTING GROUP LLC; GLOBALX VC LLC; JOHN LOPINTO; ROBERT WILKOS; and LAREN PISCIOTTI, | JURY TRIAL DEMANDED |
| Defendants. | |

## COMPLAINT

Plaintiff Securities and Exchange Commission ("Commission" or "SEC"), for its

Complaint against The Pre IPO Marketplace Inc. ("Marketplace"); Keyport Venture Partners,

LLC ("Keyport Partners"); Keyport Venture Management, LLC ("Keyport Management");

Keyport Venture Advisors, LLC ("Keyport Advisors"); Principal Pre-IPO Consulting Group LLC

("Principal"); GlobalX VC LLC ("GlobalX"); John Michael LoPinto ("LoPinto"); Robert Wilkos

("Wilkos"); and Laren Pisciotti ("Pisciotti") (collectively, "Defendants"), alleges as follows:

## SUMMARY

1.      From at least October 2019 until December 2022, Defendants raised

approximately $120 million from over 900 investors in the United States and abroad by

marketing and selling securities, in the form of interests in private funds (the "Marketplace

Funds") that purportedly held stock in private companies that had not yet held initial public

offerings ("pre-IPO companies"). But Defendants procured investor funds by fraud. Specifically,

to attract investors, Defendants, directly and indirectly through their unregistered sales agents,

made false and misleading statements about the securities they purported to sell. Among the misrepresentations: (a) certain Defendants falsely told investors that the Marketplace Funds owned shares in the pre-IPO companies at the time they were sold to investors, when, in fact, they either did not own the shares or did not own enough shares to cover all interests that had been sold; (b) Defendants falsely told investors there were no upfront fees or commissions when, in fact, they paid themselves and their sales agents at least $16 million in commissions through undisclosed price increases; (c) Defendants falsely claimed that they acquired pre-IPO shares directly from the pre-IPO companies or their employees, when Defendants typically either acquired them second-hand or purchased interests in third-party funds that purported to own the shares; and (d) Defendants told investors that their funds and operating entities were registered with the SEC, when they were not, and promoted to investors SEC filings (specifically SEC Forms D) containing false information about the Marketplace Funds and/or the operating entities.

2.    Defendants and their agents made these false and misleading statements in telephone conversations and emails with prospective investors, as well as in various offering documents related to the investments that the Defendants and their agents provided to investors.

3.    In addition, Marketplace, Keyport Partners, Keyport Management, Keyport Advisors, LoPinto, and Wilkos (collectively, the "Marketplace Defendants") represented to investors that the assets of each Marketplace fund would remain segregated from all other series funds, even though assets were regularly commingled. And LoPinto, who had a lengthy history of infractions related to securities regulations, used an alias to conduct business in order to hide his troubled history from investors.

4.      As a result of Defendants' fraud, investors suffered substantial pecuniary harm. Many investors never received the pre-IPO shares that they were promised when they invested in the Marketplace Funds, even after the company at issue subsequently went public. Those investors who actually received the pre-IPO securities they were promised often paid a substantial price increase and were charged hidden costs and fees. Defendants and their agents, meanwhile, made millions of dollars in undisclosed commissions.

5.      The SEC brings this action pursuant to Sections 20(b) and 20(d) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77t(b) and 77t(d)]; Section 21(d) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78u(d)]; and Sections 209(d) and 209(e) of the Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C. §§ 80b-9(d) and 80b-9(e)].

6.      The SEC seeks a permanent injunction against Defendants that enjoins them from engaging in the transactions, acts, practices, and courses of business alleged in this Complaint; disgorgement of all ill-gotten gains from the unlawful conduct set forth in this Complaint pursuant to Sections 21(d)(3), 21(d)(5), and 21(d)(7) of the Exchange Act [15 U.S.C. §§ 78u(d)(3), 78u(d)(5), and 78u(d)(7)], together with prejudgment interest; civil penalties as to each Defendant pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)], and Section 209 of the Advisers Act [15 U.S.C. § 80b-9]; an officer or director bar pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d0(2)]; a permanent injunction against LoPinto barring him from directly or indirectly, including (but not limited to) through any entity owned or controlled by him, participating in the issuance, purchase, offer, or sale of any security, provided, however, that such injunction shall not prevent him from

purchasing or selling securities listed on a national securities exchange for his own personal account; and such other relief as the Court may deem just and proper.

## JURISDICTION AND VENUE

7.     This Court has jurisdiction over this action pursuant to Securities Act Section 22(a) [15 U.S.C. § 77v(a)], Exchange Act Section 27 [15 U.S.C. § 78aa], and Advisers Act Section 214(a) [15 U.S.C. § 80b-14(a)].

8.     Defendants, directly and indirectly, have made use of the means or instrumentalities of interstate commerce or of the mails in connection with the transactions, acts, practices, and courses of business alleged herein.

9.     Venue lies in this district under Securities Act Section 22(a) [15 U.S.C. § 77v(a)], Exchange Act Section 27 [15 U.S.C. § 78aa], and Advisers Act Section 214 [15 U.S.C. § 80b-14] because certain of the acts, practices, and courses of conduct constituting violations of the federal securities laws occurred within this district. Defendant LoPinto resides within this district, and at least one of the victims of the fraud alleged herein resides within this district.

## DEFENDANTS

### A.     The Pre IPO Marketplace Defendants

10.     The Pre IPO Marketplace Inc. ("Marketplace"), a Delaware corporation based in New Jersey, has never been registered with the Commission in any capacity. Marketplace is owned equally in 50% shares by LoPinto and Wilkos and is entirely controlled by them. Marketplace is the manager for 22 of the 31 Marketplace Funds.

11.     Keyport Venture Partners, LLC ("Keyport Partners"), a Delaware limited liability company based in New Jersey, has never been registered with the Commission in any capacity. Keyport Partners is owned equally in 50% shares by LoPinto and Wilkos and is entirely

controlled by them. Keyport Partners is the manager for seven of the 31 Marketplace Funds and serves as the organizer and investment adviser for 23 of the 31 Marketplace Funds.

12.     Keyport Venture Management, LLC ("Keyport Management"), a New Jersey limited liability company based in New Jersey, has never been registered with the Commission in any capacity. Keyport Management is owned equally in 50% shares by LoPinto and Wilkos and is entirely controlled by them. Keyport Management is the manager for one of the Marketplace Funds.

13.     Keyport Venture Advisors, LLC ("Keyport Advisors," and together with Keyport Partners and Keyport Management, "the Keyport Entities"), a New Jersey limited liability company based in New Jersey, has never been registered with the Commission in any capacity. Keyport Advisors is owned equally in 50% shares by LoPinto and Wilkos and is entirely controlled by them. Keyport Advisors is the organizer and investment adviser for one of the Marketplace Funds. In October 2019, LoPinto and Wilkos founded the Keyport Venture Partners LLC Fund ("Keyport Fund"), with Keyport Advisors listed as the manager. In September 2020, the SEC alleged that LoPinto and Wilkos misrepresented to investors that one fund already held shares of a pre-IPO company, when in reality they knew they were having difficulty locating shares. The SEC instituted settled public administrative and cease-and-desist proceedings against Keyport Advisors, LoPinto, and Wilkos for violating the Advisers Act based on this conduct. Keyport Advisors, LoPinto, and Wilkos were subject to a cease-and-desist order, censure, and a $80,000 civil penalty.

14.     John Michael LoPinto, 46, resides in Staten Island, New York. LoPinto is a co-founder and co-owner of Marketplace; The Pre-IPO Marketplace, LLC, *see infra* ¶ 19; and the Keyport Entities. He previously held Series 7 and 63 licenses and was a registered representative

associated with seven registered broker-dealers from 2002 until 2019. In 2020, the SEC charged

LoPinto for violating Section 206(4) of the Advisers Act and Rule 206(4)-8 thereunder. *See supra*

¶ 13. LoPinto is also subject to certain customer complaints through arbitrations involving FINRA,

a self-regulatory organization to which most Commission-registered broker-dealers belong. In 2022,

FINRA sanctioned LoPinto for excessively trading in customers' accounts. LoPinto paid a fine and

restitution and was suspended by FINRA from January 18, 2022 through October 17, 2022.

15.    Robert R. Wilkos, 56, resides in Holmdel, New Jersey. Wilkos is a co-founder and

co-owner of Marketplace; The Pre-IPO Marketplace, LLC, *see infra* ¶ 19; and the Keyport

Entities. Wilkos previously held Series 7 and 63 licenses and was a registered representative

associated with five registered broker-dealers from 1998 until 2009. In 2020, the SEC charged

Wilkos for violating Section 206(4) of the Advisers Act and Rule 206(4)-8 thereunder. *See supra*

¶ 13.

**B.    The Principal Pre-IPO Defendants (The "Principal Defendants")**

16.    Principal Pre-IPO Consulting Group LLC ("Principal"), a New Jersey limited

liability company based in New Jersey, has never been registered with the Commission in any

capacity. Although owned in name by Individual A and Individual B who hold 95% and 5%

interests, Principal is controlled by Laren Pisciotti. Principal marketed and referred investors to

the Marketplace Funds.

17.    GlobalX VC LLC ("GlobalX"), a Delaware limited liability company based in

New Jersey, has never been registered with the Commission in any capacity. GlobalX is 100%

owned and controlled by Laren Pisciotti. GlobalX serves as the organizer and investment adviser

for seven of the 31 Marketplace Funds.

18.    Laren Pisciotti, 36, resides in Manalapan, New Jersey. Pisciotti is the founder and

owner of GlobalX, and she controls Principal. Pisciotti was previously a registered representative

and a registered investment advisory representative and was associated with four registered broker-dealers (one of which was dually registered as an investment adviser) and an additional registered investment adviser from 2009 until 2020. Pisciotti previously held Series 7, 63, and 66 licenses.

## OTHER RELEVANT ENTITY

19.     The Pre-IPO Marketplace, LLC, a Delaware corporation based in New Jersey, has never been registered with the Commission in any capacity. The Pre-IPO Marketplace, LLC serves as the Master LLC for 30 of the 31 Marketplace Funds.

## FACTS

**I.     THE MARKETPLACE DEFENDANTS DEFRAUDED INVESTORS BY SELLING INTERESTS IN THE MARKETPLACE FUNDS.**

### A. Background

20.     In August 2020, LoPinto and Wilkos formed the Marketplace Funds, a group of private investment funds purportedly established to make equity investments in pre-IPO companies. Between July 2020 and December 2022, based on an analysis of Marketplace's records, the Marketplace Funds grew to include at least 31 private investment funds purportedly holding securities in 27 different pre-IPO issuers, raising approximately $120 million in investments. LoPinto and Wilkos set up a separate company, The Pre IPO Marketplace Inc. ("Marketplace"), to manage most of the funds.

21.     Shares of pre-IPO companies are often held by early-stage investors and private company employees and typically are not widely available to the investing public. They can be attractive to investors when there is a perceived high demand for shares, and therefore potential for substantial returns in the event the company later makes a public offering.

22.     As devised by LoPinto and Wilkos, Marketplace's business model was purportedly to acquire shares in successful private companies that were expected to conduct an

IPO in the near future and then sell those interests to investors through the Marketplace Funds. Investors were told that they would own shares in the fund specific to the pre-IPO company in which they were interested. After the pre-IPO company had its IPO, the fund would then distribute the underlying shares of the now-public company to the fund investors.

23.     In reality, rather than acquire shares in private companies as they told investors, Marketplace, LoPinto, and Wilkos most often acquired interests in other third-party funds that themselves purported to own shares, and only occasionally did what they promised by purchasing actual pre-IPO shares directly from the private companies.

24.     LoPinto, and occasionally Wilkos, sought to obtain shares or an interest in the pre-IPO company from the third party funds. Specifically, they made decisions about which issuers to purchase and what price to pay, led negotiations with the third-party fund or holders of the pre-IPO shares, and entered into agreements to acquire the interest. LoPinto and Wilkos also decided which funds to use to acquire the interest in the pre-IPO company and wired money to fund acquisitions. Marketplace purchased some or all of the pre-IPO interests for most of the Marketplace Funds.

25.     LoPinto and Wilkos directly and indirectly, through unregistered agents, provided investors in the Marketplace Funds offering documents related to their investments, including a private placement memorandum ("PPM"), operating agreement, subscription agreement, price confirmation letter, and welcome letter (collectively the "Offering Documents"). These Offering Documents described how each "series" of the Marketplace Funds was designed to invest in the shares of a single pre-IPO company. For example, "Company A, A Series of the Pre-IPO Marketplace, LLC" purportedly owned pre-IPO shares of a particular pre-IPO company ("Company A"). Thus, at least according to the Offering Documents, an investor in "Company

A, A Series of the Pre-IPO Marketplace, LLC" would own a proportionate interest in the pre-IPO shares of Company A owned by that series fund.

26.     Each series fund was established for the purpose of making an equity investment in a specific pre-IPO company, including some well-known private companies like SpaceX and Robinhood. Based on an analysis of Marketplace's records, between July 2020 and December 2022, the Marketplace Funds grew to include at least 31 private investment funds holding securities concerning 27 different issuers, and raising approximately $120 million from investors.

27.     Most of the Offering Documents listed Marketplace, Keyport Partners, or Keyport Management (the entities owned and operated by Wilkos and LoPinto) as the fund manager. The Offering Documents listed Keyport Partners as the organizer for most of the Marketplace Funds. Each fund's Offering Documents also stated that the organizer would act as the investment adviser to the fund.

28.     The Offering Documents for the Marketplace Funds specified that interests in the funds were being offered only to investors who were "accredited" within Rule 501 of Regulation D under the Securities Act.

29.     LoPinto and Wilkos frequently distributed Offering Documents to investors.

**B. Marketplace Solicited Investors Using Unregistered Sales Agents and Broker-Dealers.**

30.     Marketplace, through its principals LoPinto and Wilkos, employed sales agents who solicited potential investors for the Marketplace Funds by cold calling, sending emails, or connecting through social media. LoPinto and Wilkos provided office space, equipment, and, at times, lead sheets, sales scripts, and instructions to these sales agents.

31.    In addition, Marketplace worked with several third-party entities and individuals who solicited potential investors for the Marketplace Funds.

32.    LoPinto and Wilkos also solicited investors directly themselves, cold calling potential investors and reaching out to prospective investors through email or social media.

33.    Marketplace paid its sales agent employees and third-party sales agents a commission for successfully soliciting investors. That commission was based on a percentage of the price increase on the investment, meaning the difference between the price at which Defendants purchased the pre-IPO shares and the price at which they sold shares to the investors through the Marketplace Funds.  LoPinto and Wilkos also paid themselves commissions for their own successful solicitations and agreed to split the profits on shares equally between the two of them after any sales agents had been paid their commissions.

34.    Between approximately February 2020 and August 2022, Marketplace paid at least $16 million in commissions to LoPinto, Wilkos, and its sales agents who solicited the investments.

35.    At all relevant times, neither LoPinto, Wilkos, nor the sales agents they managed were registered with the SEC as brokers nor were they associated with any broker-dealer or any other entity registered with the SEC.

### C. The Marketplace Defendants Made Multiple Misrepresentations to Investors.

36.    The Marketplace Defendants made a series of misrepresentations to investors about the securities they were purporting to sell. Specifically, they misrepresented their ownership of the pre-IPO securities at issue, misrepresented the source of the securities they purported to purchase, lied about not charging fees and commissions, concealed the role played by LoPinto in the management and operation of the Marketplace Funds, falsely claimed that the

funds were registered with and supervised by the SEC, and misrepresented that investor money would be segregated by fund, even though they were frequently commingled.

### 1. The Marketplace Defendants Lied About Owning Pre-IPO Shares.

37.    The Marketplace Defendants falsely represented to prospective investors during the solicitation process (directly and indirectly through sales agents) that the Marketplace Funds owned the pre-IPO shares underlying the Marketplace Funds. Notwithstanding these representations to investors, and as the Marketplace Defendants knew or were reckless in not knowing, the Marketplace Funds often did not own the underlying shares in the pre-IPO companies at the time the interests in the series funds were sold to investors or did not own enough shares to cover all interests that had been sold.

38.    The Marketplace Defendants misrepresented their ownership interest in their welcome letters for the different Marketplace Funds, which were disseminated to investors and some of which were unsigned or came from email accounts generically named "Investor Relations" or "Info." For example, a December 11, 2020 welcome letter to a Pre-IPO Marketplace investor misrepresented that the series fund "currently holds a beneficial interest of shares of common stock of Airbnb." At the time, as the Marketplace Defendants knew or were reckless in not knowing, the fund held no such interest. Similarly, a June 21, 2021 welcome letter to a different Pre-IPO Marketplace investor misrepresented that the fund "currently holds a beneficial interest in shares of common stock of Addepar." Again, as the Marketplace Defendants knew or were reckless in not knowing, the fund held no such interest at that time.

39.    Based on an analysis of Marketplace's records, as of December 2022, Marketplace Defendants operated the Marketplace Funds at a share deficit with respect to approximately 18 out of 27 issuers. In other words, for approximately 18 of the 27 issuers, the

Marketplace Defendants sold more shares than they ever owned. The Marketplace Defendants were aware of the shortfalls and discussed them via text message. At times, part of the model the Defendants used to operate their business included raising the money from investors first and then purchasing the shares. As LoPinto told Pisciotti via text on August 25, 2020, "We will raise the funds from the clients then make the purchase."

40.     The Marketplace Defendants were, at times, able to purchase pre-IPO shares for the Marketplace Funds sufficient to cover the interests that they had already sold. Other times, however, the Marketplace Defendants failed to obtain enough pre-IPO shares to cover the interests they had already sold, resulting in shortfalls. To cover shortfalls, Marketplace, the Keyport Entities, and LoPinto sometimes resorted to purchasing shares on the open market after the initial public offering, contrary to their representations to investors.

41.     Many Marketplace Fund investors *still* have not received any distributions for their investments, including for investments in which the underlying company made its IPO as early as 2020. In addition, for at least 16 of the Marketplace Funds, the Marketplace Defendants raised funds from investors prior to purchasing *any* shares of the underlying companies. In one instance, 287 days elapsed between the Marketplace Defendants' receipt of investor funds (over $350,000) and the first purchase of the shares.

42.     The Marketplace Defendants' repeated offers to sell to investors interests in pre-IPO shares that, contrary to their statements, they did not own were materially false and misleading. Reasonable investors would have wanted to know that the Marketplace Defendants did not own the interest in pre-IPO shares that they were supposedly selling, facts that the Marketplace knew or were reckless in not knowing. Reasonable investors would also have

wanted to know that there was no guarantee that they would ever receive the interest in pre-IPO shares that they thought they were purchasing.

### 2. The Marketplace Defendants Lied About How They Would Acquire the Pre-IPO Shares.

43.     The Marketplace Defendants lied to prospective investors about the nature of their investment in the pre-IPO shares, including falsely representing to investors that the shares they were purchasing were "direct"—i.e., shares purchased directly from the pre-IPO company or its employees and thereby owned directly by the Marketplace Fund, instead of an indirect interest owned through another fund. For example, on December 23, 2020 and February 22, 2021, respectively, LoPinto told prospective investors that Robinhood shares were purchased from "Robinhood directly" or as a "direct transfer from Robinhood," when in fact, as the Marketplace Defendants knew or were reckless in not knowing, the Marketplace Fund never purchased shares directly from Robinhood.

44.     The Marketplace Defendants made similar misrepresentations about the source of the shares in their Offering Documents, including in their PPMs. For example, the PPM for Addepar stated that "[t]he Portfolio Company [Addepar] Securities will be acquired by the ***Fund directly from the Portfolio Company*** in a private placement conducted by the Portfolio Company" (emphasis added). This was false, as the Marketplace Defendants knew or were reckless in not knowing. The Marketplace Defendants bought shares for Addepar from third-party entities and interests in a third-party fund that purportedly held Addepar shares, and not from the company or its employees.

45.     These misstatements were material. Prospective investors specifically asked LoPinto, Wilkos, and Pisciotti about the source of the pre-IPO shares before committing to making their investments because they cared about this issue. Reasonable investors would have

wanted to know that, rather than being given a unique opportunity to access pre-IPO shares directly from the source, they were instead purchasing an indirect interest in the securities, through a middleman.

### 3. The Marketplace Defendants Lied About Fees and Commissions.

46.    The Marketplace Defendants also lied to investors about fees and commissions they charged. As part of their standard sales pitch in soliciting investors, the Marketplace Defendants falsely told investors that they would be charged no fees, and that the Marketplace Defendants would only take "carried interest" on the "backend"—meaning a percentage of the profit when the shares were sold after the company made its initial public offering. For example, Wilkos wrote in a November 20, 2020 email to a potential investor in the Airbnb series fund, "[W]e don't charge you any fees. We have a commission structure from 1-10% maximum on your profit only, when it's time to sell your shares." Similarly, on November 17, 2020, LoPinto wrote to a potential investor in the Airbnb series fund, "No maint fees will be passed on. No expenses will be passed on to the investors...The carry percentage is in the terms on the documents. No fees or expenses. No operating expenses." As the Marketplace Defendants knew or were reckless in not knowing, these statements were false and misleading.

47.    Similarly, the Offering Documents for the Marketplace Funds contained false information about the existence of fees and commissions. The PPMs for 25 out of 31 of the Marketplace Funds stated that no upfront fees would be paid to the funds' managers and organizers. For example, the PPM for most of the series funds states, on the first page in all capital letters, "THE MANAGER WILL NOT RECEIVE ANY COMMISSIONS OR FEES FOR THE SALE OF INTERESTS PURSUANT TO THE MEMORANDUM." As the Marketplace Defendants knew or were reckless in not knowing, these statements were false and misleading.

48.    The welcome letters investors received as part of their investment materials also represented that that there were no upfront fees. For example, the welcome letter for one Marketplace Fund investor stated, "No fees have been deducted and $249,885.00 has been applied to [the investment]," and also indicated, "The following fees have been deducted from your capital contribution: 0 Management Fees." As the Marketplace Defendants knew or were reckless in not knowing, these statements were false and misleading.

49.    Similarly, certain public filings concerning the Marketplace Funds also misrepresented that there were no upfront fees. A third party manager and administrator filed SEC Forms D, which were publicly available for two of the Marketplace Funds: one for the SpaceX series fund in September 2021 and one for the Airbnb series fund in January 2021. The Forms D filed for the SpaceX and Airbnb series funds stated that both funds paid $0 in sales commissions and finders' fees, and $12,500 and $10,500 in payments to executive officers, directors, or promoters, respectively.

50.    Contrary to these representations and unbeknownst to investors, and as the Marketplace Defendant knew or were reckless in not knowing, Marketplace's records indicate that it charged investors a price increase on the pre-IPO shares offered for 23 out of 27 pre-IPO companies covered by the Marketplace Funds, with the price increase averaging 21% and ranging from between 1% and 60%. The prices paid by investors for their interest in the series fund was purportedly the price of the underlying shares in the pre-IPO company. In reality, the Marketplace Defendants charged a price increase and pocketed the difference.

51.    Again, this was not an accident, but rather part of the business model. In text exchanges, Wilkos and LoPinto discussed what price increase they should charge for various pre-IPO shares and how the price increase would be split among themselves and sales agents.

52.     These misrepresentations were material. Reasonable investors would have wanted to know their investment's fee structure and would have wanted to know that the Marketplace Defendants significantly increased the price of purchasing an interest in pre-IPO shares.

### 4. The Marketplace Defendants Concealed LoPinto's Role in Marketplace.

53.     The Marketplace Defendants also misled investors about LoPinto's identity and involvement in the Marketplace Funds, thereby concealing his disciplinary history. After LoPinto and Wilkos settled with the SEC in September 2020, the offering materials related to the Marketplace Funds were altered to remove any reference to LoPinto as part of the management of the fund and frequently only included Wilkos as a "Manager Contact." In October 2020, LoPinto began using the name "John Michael," when corresponding with investors (Michael is LoPinto's middle name). Around December 2020, the signatory on the welcome letters was changed from LoPinto to "Investor Relations." In addition, LoPinto's LinkedIn profile, which identifies him as the CEO of Marketplace, used the name "John Michael." Investors who invested in the Marketplace Funds after LoPinto began using the name "John Michael," were unaware of his prior disciplinary history.

54.     Though LoPinto's full name was removed from the Offering Documents, LoPinto's actual role in the business remained unchanged. He continued recruiting and overseeing sales agents, soliciting investors, managing corporate bank accounts, and making investment decisions, such as which pre-IPO stocks to buy, when, and for what price. Wilkos knew of and actively participated in concealing the role LoPinto played throughout the duration of their business relationships.

55.     The Marketplace Defendants' concealment of LoPinto's role in the Marketplace Funds was material. Reasonable investors would have wanted to know that one of the managers

of the Marketplace Funds had run afoul of both FINRA and the SEC. Indeed, investors who subsequently discovered his real identity stated that they would not have invested with him had they known about his disciplinary history.

### 5. Marketplace, LoPinto, and Wilkos Lied About Registration With and Supervision by the SEC.

56.     In order to suggest their investment would be safe and legitimate, Marketplace, LoPinto, and Wilkos told prospective investors that the Marketplace Funds and operating entities were registered with or under the supervision of the SEC.

57.     At no point in time were the Marketplace Funds or any of the operating entities registered with the SEC.

58.     For example, in a November 10, 2021 email, in response to an investor that raised questions about whether Marketplace was a "fraudulent company," Wilkos attempted to reassure the individual by saying, "[W]e are under SEC supervision so I can assure you, your investment is SAFE AND SECURE." None of the entities involved with the Marketplace Funds were under the SEC's "supervision."

59.     Similarly, in a November 11, 2022, email to an investor, LoPinto sent a link to the Form D for a SpaceX series fund to a prospective investor, writing, "We [Marketplace] are registered with the SEC."

60.     As previously licensed and experienced securities industry professionals, LoPinto and Wilkos knew or were reckless in not knowing that the Marketplace Funds and the operating entities were not SEC registered or under the SEC's "supervision," as they had falsely told investors.

61.     These misrepresentations were material. LoPinto referred investors to their purported "registration" with the SEC precisely because he knew or should have known that

investors would interpret that to mean that their investment was safe. Reasonable investors would have wanted to know that their investments were not under SEC "supervision" and were neither safe nor secure.

### 6. The Marketplace Defendants Improperly Commingled Fund Assets.

62.     The Marketplace Defendants falsely told investors in the Marketplace Funds that that their investments would be treated separately from other series funds and that their investment would be used only to purchase interests in the particular pre-IPO company in which they were investing. In fact, their funds were commingled with other investor funds and then used for impermissible purposes. The PPMs for the Marketplace Funds represented: "Each series is effectively treated as a separate entity, meaning the debts, liabilities, obligations, and expenses of one series cannot be enforced against another series of the LLC or against the LLC as a whole." Similarly, the operating agreements state, "[T]he Manager shall maintain separate and distinct records for each Series, shall separately hold and account for the assets of each Series . . ."

63.     These statements were false, as the Marketplace Defendants knew or were reckless in not knowing. In fact, the Marketplace Defendants did not segregate the assets of the Marketplace Funds by series. Although some of the individual Marketplace Funds had separate bank accounts and brokerage accounts, the assets in the Marketplace Funds' bank accounts were regularly commingled. Investor funds were regularly transferred between the bank accounts of different series funds, and investments for the Marketplace Fund for one pre-IPO company were often used to purchase the interests in another pre-IPO company. New investor money was used at times to purchase shares in other series funds to provide other investor redemptions or

distributions in a Ponzi-like fashion.

64.      These misrepresentations were also material. Reasonable investors would have wanted to know that their investments were not paying for the interest in pre-IPO shares they believed they were acquiring, but rather were being used to purchase interests in other companies on behalf of other investors.

## II.    THE PRINCIPAL DEFENDANTS DEFRAUDED INVESTORS IN SELLING INTERESTS IN THE MARKETPLACE FUNDS.

### A.  Background

65.      In approximately June 2020, Pisciotti began working with Wilkos and LoPinto, operating her entities Principal and GlobalX in shared office space with the Marketplace Defendants. Although Principal was formed under the names of Individual A and Individual B, Pisciotti was the company's principal, represented herself as such in communications with investors, and was featured on Principal's website as its managing director. Pisciotti was the founder and 100% owner of GlobalX.

66.      Pisciotti played an active role with respect to the Marketplace Funds. Pisciotti helped acquire pre-IPO shares for the Marketplace Funds by reaching out to sellers of pre-IPO shares searching for inventory, leading negotiations with the holders of pre-IPO shares, and deciding which issuers to purchase, and at what price. Pisciotti's entity, GlobalX, was the organizer and investment adviser for seven of the 31 Marketplace Funds. Marketplace's records indicate that Pisciotti and GlobalX purchased the pre-IPO shares, or a portion of the pre-IPO shares, for eight of the 27 pre-IPO companies covered by the Marketplace Funds and aided with purchases for two additional issuers. Pisciotti also signed and distributed price confirmation letters to some investors and distributed welcome letters and other offering materials to some investors.

## B. The Principal Defendants Solicited Investors Using Unregistered Sales Agents and Broker-Dealers.

67.     Principal, through Pisciotti, solicited potential investors for the Marketplace Funds both directly and indirectly through sales agents. Pisciotti cold called potential investors and contacted prospective investors through email or social media and received transaction-based compensation for her efforts. She also recruited sales agents to make cold calls and solicit investors for the Marketplace Funds on behalf of Principal, sometimes providing lead sheets and sales pitch information and sales scripts for the sales agents to use when calling investors. For each successful investment that Pisciotti or her sales agents brought to the Marketplace Funds, Principal received half of the price increase charged to the investor.

68.     Principal and Pisciotti paid their unregistered sales agents a transaction-based fee based on investments they successfully solicited. Principal entered into referral agent agreements with a few of these sales agents. The agreements generally provided unregistered sales agents a percentage of funds invested by referral clients or a percentage of the price increase (the difference between the price at which the investors purchased the pre-IPO shares and the price at which the shares were sold to the relevant series fund).

69.     At all relevant times, Principal and the sales agents Pisciotti managed were neither registered as brokers with the Commission nor were the sales agents she managed associated with any broker-dealer registered with the Commission. Pisciotti herself was associated with her former employer, a broker-dealer, the first few months she worked with Marketplace Funds, and was otherwise not registered with the Commission as a broker nor associated with any broker-dealer registered with the Commission.

70.     Pisciotti and sales agents working for her brought in approximately $90 million of the $120 million that was invested in the Marketplace Funds between July 2020 and December 2022.

### C. The Principal Defendants Made Multiple Misrepresentations to Investors.

71.     The Principal Defendants made a series of misrepresentations to investors about the securities they were purporting to sell. Specifically, they lied about not charging fees and commissions, misrepresented their ownership of the pre-IPO securities at issue, and falsely claimed that the funds were registered with and supervised by the SEC.

### 1. The Principal Defendants Lied About Fees and Commissions.

72.     The Principal Defendants (Pisciotti, Principal and GlobalX) lied about the fees and commissions charged to investors.

73.     For example, in October 2020, after reviewing the Offering Documents for the SpaceX series fund, a potential investor sent an email to Principal's general email box (info@principalpreipo.com) asking to speak to the "head of your company." In response, the investor received an email stating, "I am the head of the company, I am the managing director and founder as discussed." In a parallel email chain, the same investor reached out to the same Principal email address asking if, other than the 10% carried interest fee, there were "any other fees or charges whatsoever." Principal responded, "as far as fees, those are all the charges involved." When further pressed by the potential investor, "Just that we are on the same page: there would not be **any** fees, interests or charges. Correct? [emphasis in original]," Principal responded, "Correct." As the Principal Defendants knew or were reckless in not knowing, this was false. In fact, investors paid on average 23% more for the shares in the SpaceX series fund

than Marketplace paid when it purchased them.

74.    Pisciotti signed and distributed price confirmation letters to investors, which also falsely stated there were no fees. For example, a Marketplace price confirmation letter signed by Pisciotti for the TAE Technologies series fund dated July 20, 2021 stated, "Your investment will have a management fee of 0%. Your investment will have a 'carry percentage' – back-end fee of 0%." As the Principal Defendants knew or were reckless in not knowing, this was a lie. The Principal Defendants sold interests in the TAE Technologies series fund at a 37% price increase from the purchase price of the underlying shares.

75.    GlobalX served as the organizer and investment adviser for at least seven Marketplace Funds for which the Offering Documents misrepresented that there were no upfront fees. For example, the PPM for the TAE Technologies series fund stated, "THE MANAGER WILL NOT RECEIVE ANY COMMISSIONS OR FEES FOR THE SALE OF INTERESTS PURSUANT TO THE MEMORANDUM," and also, "The Manager will not receive a management fee." As explained above, as the Principal Defendants knew or were reckless in not knowing, this was not true.

76.    The Principal Defendants knew that significant fees and commissions other than carried interest were paid out of investor funds to themselves, to Wilkos and LoPinto, and to other sales agents. Between August 2020 and December 2021, records indicate that Principal was paid at least $7 million in commissions for its successful solicitation of investors into the Marketplace Funds.

77.    These misrepresentations were material. Reasonable investors would have wanted to know their investment's fee structure and would have wanted to know that the Marketplace Defendants significantly increased the price of purchasing an interest in pre-IPO shares.

## 2. The Principal Defendants Lied About their Ownership Interest in the Pre-IPO Shares.

78.    The Principal Defendants lied to prospective investors about the nature of Defendants' ownership interest in pre-IPO shares for the Marketplace Funds. For example, on October 1, 2020, Principal, via a general e-mail address, falsely told a prospective investor interested in investing in SpaceX, "We acquire shares from insiders of companies through our direct contacts." In fact during this period, the Marketplace Funds did not directly hold SpaceX shares and only held interests in third-party funds that purportedly held shares in SpaceX. Pisciotti, who managed Principal, knew that the Marketplace Funds had not directly acquired SpaceX shares from insiders of the company because she also controlled GlobalX, which served as the organizer and investment adviser for the Marketplace Fund SpaceX II series fund and assisted LoPinto with the indirect purchase of SpaceX and other pre-IPO stock through third parties.

79.    In addition, GlobalX misrepresented the source of the shares in the Offering Documents for SpaceX and two other Marketplace Funds for which it served as organizer and investment adviser. For example, the PPM for the SpaceX II series fund states, "The Portfolio Company Securities will be acquired by the Fund directly from the Portfolio Company in a private placement conducted by the Portfolio Company in accordance with Regulation D." Defendants never obtained SpaceX shares directly from SpaceX, and as noted above, Pisciotti knew or was reckless in not knowing these statements to investors regarding their ownership interest in the shares were false because she was often involved in acquiring the shares for Marketplace.

80.    These misstatements were material. Prospective investors specifically asked LoPinto, Wilkos, and Pisciotti about the source of the pre-IPO shares before committing to

making their investments because they cared about this issue. Reasonable investors would have wanted to know that, rather than being given a unique opportunity to access pre-IPO shares directly from the source, they were instead purchasing an indirect interest in the securities, through a middleman.

### 3. Principal and Pisciotti Lied about Registration With the SEC.

81.     Principal and Pisciotti lied about the Marketplace Funds and operating entities being registered with the SEC. On October 1, 2020, a prospective investor sought assurances about the credibility of Marketplace. Via email, someone who described themselves as the "managing director and founder" of Principal responded that Principal "only work[s] with SEC registered funds." After being asked subsequently to provide "evidence showing that the fund [Pre IPO Marketplace] . . . is registered with the SEC," the Principal email sent a link to the Form D for the offering, noting that it "show[s] they are registered with the SEC." These and other similar representations about SEC registration made by Principal were false.

82.     As a previously licensed broker, former registered investment adviser representative, and experienced securities industry professional, Pisciotti knew or was reckless in not knowing that the Marketplace Funds and operating entities were not registered with the SEC.

83.     These misrepresentations were material. Principal and Pisciotti referred investors to their purported "registration" with the SEC precisely because they knew or should have known that investors would interpret that to mean that their investment was safe. Reasonable investors would have wanted to know that their investments were not under SEC supervision and were neither safe nor legitimate.

### III.   DEFENDANTS VIOLATED SECURITIES ACT SECTION 5 BY OFFERING AND SELLING SECURITIES WITH NO REGISTRATION STATEMENT IN EFFECT OR APPLICABLE EXEMPTION.

84.     Securities Act Section 5 [15 U.S.C. § 77e] makes it unlawful for any person, directly or indirectly, to offer or sell securities, unless a registration statement is filed with the Commission and is in effect as to such offer or sale.

85.     None of the interests in the Marketplace Funds were offered or sold pursuant to a registration statement filed with the Commission.

86.     Marketplace, Principal, LoPinto, Wilkos, and Pisciotti took steps necessary to the distribution of interests in the Marketplace Funds, including by soliciting investors and directing others to do so too.

87.     Marketplace purported to offer the interests in the Marketplace Funds pursuant to Rule 506(c) of Regulation D [17 C.F.R. § 230.506(c)], which provides a safe harbor registration exemption under Securities Act Section 4(a)(2) for qualifying private offerings.

88.     To qualify for the Rule 506(c) safe-harbor, all purchasers of the securities sold must be "accredited investors"—that is, for example, individual investors who had a net worth (with their spouse) of more than $1 million or annual income exceeding $200,000 or joint income exceeding $300,000. 17 C.F.R. §§ 230.501(a)(5), (a)(6). In addition, the issuer of the securities must take reasonable steps to verify that the purchasers of the securities are accredited investors, which may include reviewing documentation such as tax records and brokerage or bank account statements. 17 C.F.R. § 230.506(c)(2)(ii).

89.     Marketplace and Principal advertised to the general public. Both Marketplace and Principal maintained public websites with information about the Marketplace Funds. They both

also advertised the Marketplace Funds through social media such as Facebook, Twitter, and LinkedIn.

90.    Neither Marketplace, Principal, LoPinto, Wilkos, or Pisciotti took reasonable steps to verify that the purchasers of the securities in the Marketplace Funds were accredited investors.

91.    Aside from (1) occasionally purchasing cold call lists that purported to include only accredited investors, and (2) requesting that investors self-certify their accredited investor status, Marketplace, LoPinto, and Wilkos took no steps to verify accredited investor status for investors they solicited.

92.    In addition, Marketplace, LoPinto, and Wilkos took no steps to verify accredited investor status for investors solicited by sales agents. The investors were simply instructed to check the form on the subscription agreement indicating they were accredited investors, without being provided further guidance on the meaning of "Accredited Investor." Marketplace, LoPinto, and Wilkos failed to verify these claims by asking for or collecting any of the types of documents identified in Rule 506(c)(2)(ii) that would verify investors' accredited status.

93.    Similarly, Principal and Pisciotti took no steps to verify the accredited status of any investors she or her agents solicited and in fact sold investments to unaccredited investors. Moreover, Regulation D was unavailable from January 18, 2022 through October 17, 2022 for all the Marketplace Funds open during this period because LoPinto served in a covered person role while being disqualified under Rule 506(d)(1)(vi) of Regulation D. Specifically, LoPinto became a bad actor under that rule during this time period due to a FINRA suspension that related to LoPinto excessively trading in customers' accounts. During the period of disqualification, LoPinto received significant compensation from the offerings while also engaging in solicitations, was a "promoter"

as defined in Rule 405 who was "connected to the issuer" at the time of the sales of all of the

Marketplace Funds open during this period, and was an "investment manager" under Rule 506(d)

because he served as an investment adviser to many of the Marketplace Funds. *See* Rule 506(d)(1)

of Regulation D [17 C.F.R. § 230.506(d)(1)].

## IV.    DEFENDANTS ENGAGED IN UNREGISTERED BROKER-DEALER ACTIVITY AND EMPLOYED UNLICENSED AND UNREGISTERED SALES AGENTS IN VIOLATION OF EXCHANGE ACT SECTION 15.

94.    Exchange Act Section 15(a)(1) makes it unlawful for any broker or dealer "to

effect any transaction in, or to induce or attempt to induce the purchase or sale of, any security"

unless such broker or dealer is registered with the Commission. 15 U.S.C. § 78o(a)(1).

95.    Marketplace, Principal, LoPinto, Wilkos, and Pisciotti violated these provisions

by directly soliciting investors, negotiating between the Marketplace Funds and investors, and

handling customer funds and securities. Moreover, LoPinto, Wilkos and Pisciotti personally

received transaction-based compensation.

96.    Additionally, Marketplace, Principal, LoPinto, Wilkos and Pisciotti hired, trained,

and ran sales agents to sell interests in the Marketplace Funds, to which they paid commissions

typically generated by the undisclosed price increases on the Marketplace Funds. These sales

agents, many of whom made cold calls to potential investors using lead lists and sales scripts

provided by Defendants, were not licensed or associated with registered brokerage firms.

97.    Marketplace, Principal, LoPinto, Wilkos, and Pisciotti knew that the sales agents

they recruited to sell securities for Marketplace and Principal were not associated with a

registered broker at the time of those sales because Marketplace and Principal were not

registered brokers. Nevertheless, Marketplace, Principal, LoPinto, Wilkos, and Pisciotti paid

these unregistered sales agents commissions—that is, a percentage of the amounts of money they

raised for the Marketplace Funds. Marketplace paid at least $16 million in commissions to its principals and sales agents who solicited investments, including between August 2020 and December 2021, paying Principal at least $7 million in commissions for its successful solicitation of investors into the Marketplace Funds.

### FIRST CLAIM FOR RELIEF
**Violations of Securities Act Sections 17(a)**
**(All Defendants)**

98.     The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 97.

99.     Defendants, directly or indirectly, singly or in concert, in the offer or sale of securities and by the use of the means or instruments of transportation or communication in interstate commerce or the mails: (i) knowingly or recklessly have employed one or more devices, schemes, or artifices to defraud; (ii) knowingly, recklessly, or negligently have obtained money or property by means of one or more untrue statements of a material fact or omissions of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (iii) knowingly, recklessly, or negligently have engaged in one or more transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

100.    By reason of the foregoing, Defendants, directly or indirectly, singly or in concert, have violated and, unless enjoined, will again violate Securities Act Section 17(a) [15 U.S.C. § 77q(a)].

## SECOND CLAIM FOR RELIEF
### Violations of Exchange Act Section 10(b) and Rule 10b-5 Thereunder
### (All Defendants)

101.    The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 97.

102.    Defendants, directly or indirectly, singly or in concert, in connection with the purchase or sale of securities and by the use of means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, knowingly or recklessly have: (i) employed one or more devices, schemes, or artifices to defraud; (ii) made one or more untrue statements of a material fact or omitted to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (iii) engaged in one or more acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

103.    By reason of the foregoing, Defendants, directly or indirectly, singly or in concert, have violated and, unless enjoined, will again violate Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10(b)-5].

## THIRD CLAIM FOR RELIEF
### Violations of Advisers Act Sections 206(1) and (2)
### (Marketplace Defendants, GlobalX, and Pisciotti)

104.    The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 97.

105.    Marketplace, the Keyport Entities, and GlobalX were investment advisers under Advisers Act Section 202(11) [15 U.S.C. § 80b-2(11)] because, "for compensation," they each "engage[d] in the business of advising others . . . as to the value of securities or as to the advisability of investing in, purchasing, or selling securities." Keyport Partners, Keyport

Advisors and GlobalX were identified in the Offering Documents as investment advisers to the various Marketplace Funds. Keyport Partners, Keyport Advisors and GlobalX performed these functions in exchange for carried interest and in some instances upfront fees. Marketplace, Keyport Partners, and Keyport Management served as managers to the various Marketplace Funds, and had the ability to buy and sell assets of the various Marketplace Funds. In addition, Marketplace and GlobalX were investment advisers because they purchased the pre-IPO shares for the various Marketplace Funds, even where they had no formal role as organizer/investment adviser or manager for a particular series fund.

106.    LoPinto, Wilkos, and Pisciotti also were investment advisers under Advisers Act Section 202(a)(11). LoPinto, Wilkos, and Pisciotti jointly performed the actual responsibilities of this function, regardless of which entity was identified in the offering materials as providing advice, including by advising the Marketplace Funds on which pre-IPO shares to purchase and at what price. They further gave advice to the Marketplace Funds as to what funds would be used to pay for these purchases. Each of them also received compensation in the form of commissions.

107.    The Marketplace Defendants, GlobalX, and Pisciotti had an adviser-client relationship with and therefore owed a fiduciary duty to the Marketplace Funds.

108.    While acting as investment advisers, the Marketplace Defendants, GlobalX, and Pisciotti, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly, have: (i) knowingly or recklessly employed one or more devices, schemes, or artifices to defraud any client or prospective client; and/or (ii) knowingly, recklessly, or negligently engaged in transactions, practices, or courses of business that operated as a fraud or deceit upon any client or prospective client.

109.    By reason of the foregoing, the Marketplace Defendants, GlobalX, and Pisciotti directly or indirectly, singly or in concert, have violated and, unless enjoined, will again violate Advisers Act Section 206(1) and 206(2) [15 U.S.C. §§ 80b-6(1) and 80b-6(2)].

### FOURTH CLAIM FOR RELIEF
**Violations of Advisers Act Sections 206(4) and Rule 206(4)-8 Thereunder**
**(Marketplace Defendants, GlobalX, and Pisciotti)**

110.    The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 97.

111.    The Offering Documents for the Marketplace Funds state that the purpose of each Fund is to "invest in Portfolio Company Securities." The same documents state that each Fund relies on the exception in either Section 3(c)(1) or 3(c)(7) of the Investment Company Act.

112.    For the reasons stated *supra,* ¶¶ 105-107, the Marketplace Defendants, GlobalX, and Pisciotti were investment advisers under Advisers Act Section 202(11) [15 U.S.C. § 80b-2(11)] and had an adviser-client relationship with and therefore owed a fiduciary duty to the Marketplace Funds, which were pooled investment vehicles as defined in Rule 206(4)-8(b) [17 C.F.R. § 275.206(4)-8(b)].

113.    While acting as investment advisers, the Marketplace Defendants, GlobalX, and Pisciotti, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly, knowingly, recklessly, or negligently: (i) made one or more untrue statements of material fact or omitted to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, to any investor or prospective investor in the pooled investment vehicle; and/or (ii) engaged in any act, practice, or course of business which is fraudulent, deceptive, or manipulative, with respect to any investor or prospective investor in the pooled investment vehicle.

114.    By reason of the foregoing, the Marketplace Defendants, GlobalX, and Pisciotti, directly or indirectly, singly or in concert, have violated and, unless enjoined, will again violate Advisers Act Section 206(4) [15 U.S.C. § 80b-6(4)] and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8].

**FIFTH CLAIM FOR RELIEF**
**Violations of Securities Act Sections 5(a) and (c)**
**(Marketplace, LoPinto, Wilkos, Principal, and Pisciotti)**

115.    The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 97.

116.    Marketplace, LoPinto, Wilkos, Principal, and Pisciotti, directly or indirectly, singly or in concert, and notwithstanding the fact that there was no applicable exemption: (i) made use of the means or instruments of transportation or communication in interstate commerce or of the mails to sell, through the use or medium of a prospectus or otherwise, securities as to which no registration statement was in effect; (ii) for the purpose of delivery after sale, carried or caused to be carried through the mails or in interstate commerce, by means or instruments of transportation, securities as to which no registration statement was in effect; and/or (iii) made use of means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell, through the use or medium of a prospectus or otherwise, securities as to which no registration statement had been filed.

117.    By reason of the foregoing Marketplace, LoPinto, Wilkos, Principal, and Pisciotti, directly or indirectly, have violated and, unless enjoined, will again violate Securities Act Sections 5(a) and 5(c) [15 U.S.C. § 77e(a) and 77e(c)].

## SIXTH CLAIM FOR RELIEF
### Violations of Exchange Act Section 15(a)(1)
### (Marketplace, LoPinto, Wilkos, Principal, and Pisciotti)

118.    The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 97.

119.    Marketplace, LoPinto, Wilkos, Principal, and Pisciotti, while not registered with the Commission as a broker or dealer or associated with a registered broker or dealer, made use of the mails or other means or instrumentality of interstate commerce to effect transactions in, or to induce or attempt to induce the purchase or sale of, securities other than exempted securities or commercial paper, bankers' acceptances, or commercial bills.

120.    By reason of the foregoing, Defendants, directly or indirectly, violated and, unless enjoined, will again violate Exchange Act Section 15(a)(1) [15 U.S.C. § 78o].

## SEVENTH CLAIM FOR RELIEF
### Aiding and Abetting Violations of Securities Act Section 17(a)
### In the Alternative
### (LoPinto and Wilkos)

121.    The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 97.

122.    As alleged above, Marketplace and the Keyport Entities violated Securities Act Section 17(a) [15 U.S.C. § 77q(a)].

123.    LoPinto and Wilkos knowingly or recklessly provided substantial assistance to Marketplace and the Keyport Entities with respect to their violations of Securities Act Section 17(a) [15 U.S.C. § 77q(a)].

124.    By reason of the foregoing, LoPinto and Wilkos are liable for aiding and abetting Marketplace's and the Keyport Entities' violations of Securities Act Section 17(a) [15 U.S.C. § 77q(a)], and unless enjoined, will again aid and abet these violations.

## EIGHTH CLAIM FOR RELIEF
### Aiding and Abetting Violations of Securities Act Section 17(a)
### In the Alternative
### (Pisciotti)

125.    The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 97.

126.    As alleged above, Principal and GlobalX violated Securities Act Section 17(a) [15 U.S.C. § 77q(a)].

127.    Pisciotti knowingly or recklessly provided substantial assistance to Principal and GlobalX with respect to their violations of Securities Act Section 17(a) [15 U.S.C. § 77q(a)].

128.    By reason of the foregoing, Pisciotti is liable for aiding and abetting Principal's and GlobalX's violations of Securities Act Section 17(a) [15 U.S.C. § 77q(a)], and unless enjoined, will again aid and abet these violations.

## NINTH CLAIM FOR RELIEF
### Aiding and Abetting Violations of
### Exchange Act Section 10(b) and Rule 10b-5 Thereunder
### In the Alternative
### (LoPinto and Wilkos)

129.    The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 97.

130.    As alleged above, Marketplace and the Keyport Entities violated Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

131.    LoPinto and Wilkos knowingly or recklessly provided substantial assistance to Marketplace and the Keyport Entities with respect to their violations of Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

132.    By reason of the foregoing, LoPinto and Wilkos are liable for aiding and abetting Marketplace's and the Keyport Entities' violations of Exchange Act Section 10(b) [15 U.S.C.

§ 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and unless enjoined, will again aid and abet these violations.

## TENTH CLAIM FOR RELIEF
### Aiding and Abetting Violations of
### Exchange Act Section 10(b) and Rule 10b-5 Thereunder
### In the Alternative
### (Pisciotti)

133.    The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 97.

134.    As alleged above, Principal and GlobalX violated Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

135.    Pisciotti knowingly or recklessly provided substantial assistance to Principal and GlobalX with respect to their violations of Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

136.    By reason of the foregoing, Pisciotti is liable for aiding and abetting Principal's and GlobalX's violations of Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and unless enjoined, will again aid and abet these violations.

## ELEVENTH CLAIM FOR RELIEF
### Aiding and Abetting Violations of
### Advisers Act Sections 206(1) and (2)
### In the Alternative
### (LoPinto and Wilkos)

137.    The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 97.

138.    As alleged above, Marketplace and the Keyport Entities violated Advisers Act Sections 206(1) and 206(2) [15 U.S.C. §§ 80b-6(1) and 80b-6(2)].

139.    LoPinto and Wilkos knowingly or recklessly provided substantial assistance to Marketplace and the Keyport Entities with respect to their violations of Advisers Act Sections 206(1) and 206(2) [15 U.S.C. §§ 80b-6(1) and 80b-6(2)].

140.    By reason of the foregoing, LoPinto and Wilkos are liable for aiding and abetting Marketplace's and Keyport Entities' violations of Advisers Act Sections 206(1) and 206(2) [15 U.S.C. §§ 80b-6(1) and 80b-6(2)], and unless enjoined, will again aid and abet these violations.

**TWELFTH CLAIM FOR RELIEF**
**Aiding and Abetting Violations of**
**Advisers Act Sections 206(1) and (2)**
**In the Alternative**
**(Pisciotti)**

141.    The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 97.

142.    As alleged above, GlobalX violated Advisers Act Sections 206(1) and 206(2) [15 U.S.C. §§ 80b-6(1) and 80b-6(2)].

143.    Pisciotti knowingly or recklessly provided substantial assistance to GlobalX with respect to its violations of Advisers Act Sections 206(1) and 206(2) [15 U.S.C. §§ 80b-6(1) and 80b-6(2)].

144.    By reason of the foregoing, Pisciotti is liable for aiding and abetting GlobalX's violations of Advisers Act Sections 206(1) and 206(2) [15 U.S.C. §§ 80b-6(1) and 80b-6(2)], and unless enjoined, will again aid and abet these violations.

### THIRTEENTH CLAIM FOR RELIEF
**Aiding and Abetting Violations of**
**Advisers Act Section 206(4) and Rule 206(4)-8 Thereunder**
**In the Alternative**
**(LoPinto and Wilkos)**

145.    The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 97.

146.    As alleged above, Marketplace and the Keyport Entities violated Advisers Act Section 206(4) [15 U.S.C. § 80b-6(4)] and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8].

147.    LoPinto and Wilkos knowingly or recklessly provided substantial assistance to Marketplace and the Keyport Entities with respect to their violations of Advisers Act Section 206(4) [15 U.S.C. § 80b-6(4)] and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8].

148.    By reason of the foregoing, LoPinto and Wilkos are liable for aiding and abetting Marketplace's and the Keyport Entities' violations of Advisers Act Section 206(4) [15 U.S.C. § 80b-6(4)] and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8], and unless enjoined, will again aid and abet these violations.

### FOURTEENTH CLAIM FOR RELIEF
**Aiding and Abetting Violations of**
**Advisers Act Section 206(4) and Rule 206(4)-8 Thereunder**
**In the Alternative**
**(Pisciotti)**

149.    The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 97.

150.    As alleged above, GlobalX violated Advisers Act Section 206(4) [15 U.S.C. § 80b-6(4)] and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8].

151.    Pisciotti knowingly or recklessly provided substantial assistance to GlobalX with respect to its violations of Advisers Act Section 206(4) [15 U.S.C. § 80b-6(4)] and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8].

152.    By reason of the foregoing, Pisciotti is liable for aiding and abetting GlobalX's violations of Advisers Act Section 206(4) [15 U.S.C. § 80b-6(4)] and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8], and unless enjoined, will again aid and abet these violations.

### FIFTEENTH CLAIM FOR RELIEF
**Aiding and Abetting Violations of Securities Act Sections 5(a) and (c)**
**In the Alternative**
**(LoPinto and Wilkos)**

153.    The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 97.

154.    As alleged above, Marketplace violated Securities Act Sections 5(a) and (c) [15 U.S.C. § 77e].

155.    LoPinto and Wilkos knowingly or recklessly provided substantial assistance to Marketplace with respect to its violations of Securities Act Sections 5(a) and (c) [15 U.S.C. § 77e].

156.    By reason of the foregoing, LoPinto and Wilkos are liable for aiding and abetting Marketplace's violations of Securities Act Sections 5(a) and (c) [15 U.S.C. § 77e], and unless enjoined, will again aid and abet these violations.

## SIXTEENTH CLAIM FOR RELIEF
### Aiding and Abetting Violations of Securities Act Sections 5(a) and (c)
### In the Alternative
### (Pisciotti)

157.    The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 97.

158.    As alleged above, Principal violated Securities Act Sections 5(a) and (c) [15 U.S.C. § 77e].

159.    Pisciotti knowingly or recklessly provided substantial assistance to Principal with respect to its violations of Securities Act Sections 5(a) and (c) [15 U.S.C. § 77e].

160.    By reason of the foregoing, Pisciotti is liable for aiding and abetting Principal's violations of Securities Act Sections 5(a) and (c) [15 U.S.C. § 77e], and unless enjoined, will again aid and abet these violations.

## SEVENTEENTH CLAIM FOR RELIEF
### Aiding and Abetting Violations of Exchange Act Section 15(a)(1)
### In the Alternative
### (LoPinto and Wilkos)

161.    The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 97.

162.    Marketplace violated Exchange Act Section 15(a)(1) [15 U.S.C. § 78o] in selling the Marketplace Funds.

163.    LoPinto and Wilkos knowingly or recklessly provided substantial assistance to Marketplace with respect to their violations of Exchange Act Section 15(a)(1) [15 U.S.C. § 78o].

164.    By reason of the foregoing, LoPinto and Wilkos are liable for aiding and abetting Marketplace's violations of Exchange Act Section 15(a)(1) [15 U.S.C. § 78o], and unless enjoined, LoPinto and Wilkos will again aid and abet these violations.

## EIGHTEENTH CLAIM FOR RELIEF
### Aiding and Abetting Violations of Exchange Act Section 15(a)(1)
### In the Alternative
### (Pisciotti)

165.    The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 97.

166.    Principal violated Exchange Act Section 15(a)(1) [15 U.S.C. § 78o] in selling the Marketplace Funds.

167.    Pisciotti knowingly or recklessly provided substantial assistance to Principal with respect to its violations of Exchange Act Section 15(a)(1) [15 U.S.C. § 78o].

168.    By reason of the foregoing, Pisciotti is liable for aiding and abetting Principal's violations of Exchange Act Section 15(a)(1) [15 U.S.C. § 78o], and unless enjoined, Pisciotti will again aid and abet these violations.

## NINETEENTH CLAIM FOR RELIEF
### Violations of Exchange Act Section 10(b) and Rule 10b-5 Thereunder
### Under Section 20(a) of the Exchange Act
### (LoPinto and Wilkos)

169.    The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 97.

170.    As alleged above, the Marketplace Defendants violated Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10(b)-5].

171.    At all relevant times, Defendants LoPinto and Wilkos were control persons of the Marketplace Defendants for purposes of Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)].

172.    At all relevant times, Defendants LoPinto and Wilkos exercised power and control over the Marketplace Defendants, including by managing and directing those entities, and by

directing and participating in the acts constituting the Marketplace Defendants' violations of the securities laws.

173.    By reason of the foregoing, Defendants LoPinto and Wilkos are liable as control persons under Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)] for the Marketplace Defendants' violations of Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10(b)-5].

**TWENTIETH CLAIM FOR RELIEF**
**Violations of Exchange Act Section 10(b) and Rule 10b-5 Thereunder**
**Under Section 20(a) of the Exchange Act**
**(Pisciotti)**

174.    The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 97.

175.    As alleged above, Principal and GlobalX violated Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10(b)-5].

176.    At all relevant times, Defendant Pisciotti was a control person of Principal and GlobalX for purposes of Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)].

177.    At all relevant times, Defendant Pisciotti exercised power and control over Principal and GlobalX, including by managing and directing those entities, and by directing and participating in the acts constituting Principal's and GlobalX's violations of the securities laws.

178.    By reason of the foregoing, Defendant Pisciotti is liable as a control person under Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)] for Principal's and GlobalX's violations of Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10(b)-5].

**TWENTY-FIRST CLAIM FOR RELIEF**
**Violations of Exchange Act Section 15(a)(1)**
**Under Section 20(a) of the Exchange Act**
**(LoPinto and Wilkos)**

179.    The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 97.

180.    As alleged above, Marketplace violated Exchange Act Section 15(a)(1) [15 U.S.C. § 78o].

181.    At all relevant times, Defendants LoPinto and Wilkos were control persons of Marketplace for purposes of Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)].

182.    At all relevant times, Defendants LoPinto and Wilkos exercised power and control over Marketplace, including by managing and directing that entity, and by directing and participating in the acts constituting Marketplace's violations of the securities laws.

183.    By reason of the foregoing, Defendants LoPinto and Wilkos are liable as control persons under Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)] for Marketplace's violations of Exchange Act Section 15(a)(1) [15 U.S.C. § 78o].

**TWENTY-SECOND CLAIM FOR RELIEF**
**Violations of Exchange Act Section 15(a)(1)**
**Under Section 20(a) of the Exchange Act**
**(Pisciotti)**

184.    The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 97.

185.    As alleged above, Principal violated Exchange Act Section 15(a)(1) [15 U.S.C. § 78o].

186.    At all relevant times, Defendant Pisciotti was a control person of Principal for purposes of Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)].

187.    At all relevant times, Defendant Pisciotti exercised power and control over Principal, including by managing and directing that entity, and by directing and participating in the acts constituting Principal's violations of the securities laws.

188.    By reason of the foregoing, Defendant Pisciotti is liable as a control person under Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)] for Principal's violations of Exchange Act Section 15(a)(1) [15 U.S.C. § 78o].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court enter a Final Judgment:

## I.

In a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently restraining and enjoining (1) Defendants, their agents, servants, employees, and attorneys and all persons in active concert or participation with any of them from violating, or aiding and abetting violations of, directly or indirectly, Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10(b)-5] and Securities Act Section 17(a) [15 U.S.C. § 77q(a)]; (2) the Marketplace Defendants, GlobalX, and Pisciotti, their agents, servants, employees, and attorneys and all persons in active concert or participation with any of them from violating, or aiding and abetting violations of, directly or indirectly, Advisers Act Sections 206(1), 206(2), and 206(4) [15 U.S.C. §§ 80b-6(1), (2), and (4)] and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8]; (3) Marketplace, LoPinto, Wilkos, Principal, and Pisciotti, their agents, servants, employees, and attorneys and all persons in active concert or participation with any of them from violating, or aiding and abetting violations of, directly or indirectly, Securities Act Sections 5(a) and 5(c) [15 U.S.C. § 77e(a) and 77e(c)]; and

(4) Marketplace, LoPinto, Wilkos, Principal, and Pisciotti, their agents, servants, employees, and attorneys and all persons in active concert or participation with any of them from violating, or aiding and abetting violations of, directly or indirectly, Exchange Act Section 15(a)(1) [15 U.S.C. § 78o];

**II.**

Ordering Defendants to disgorge, on a joint and several basis, the ill-gotten gains they received as a result of the violations alleged herein and to pay prejudgment interest thereon pursuant to Exchange Act Sections 21(d)(3), 21(d)(5), and 21(d)(7) [15 U.S.C. §§ 78u(d)(3), 78u(d)(5), and 78u(d)(7)];

**III.**

Ordering Defendants to each pay a civil money penalty pursuant to Securities Act Section 20(d) [15 U.S.C. § 77t(d)], Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)], and Advisers Act Section 209 [15 U.S.C. § 80b-9];

**IV.**

Ordering that Defendants LoPinto, Wilkos, and Pisciotti be barred from serving as an officer or director of a public issuer pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)]; and

**V.**

Permanently restraining and enjoining LoPinto from directly or indirectly, including (but not limited to) through any entity owned or controlled by him, participating in the issuance, purchase, offer, or sale of any security; provided, however, that such injunction shall not prevent him from purchasing or selling securities listed on a national securities exchange for his own personal account.

## VI.

Granting such other and further relief as this Court may deem equitable and just.

### JURY DEMAND

The Commission demands a jury in this matter for all claims so triable.


Dated: September 30, 2024          Respectfully submitted,

By: */s/ John B. Timmer*
John B. Timmer (pending admission *pro hac vice*)
Daniel J. Ball (pending admission *pro hac vice*)
Randall D. Friedland (pending admission *pro hac vice*)
Eleanor J.G. Wasserman
Securities and Exchange Commission
100 F Street, N.E.
Washington, DC 20549
(202) 551-7687 (Timmer)
(202) 551-5987 (Ball)
(202) 551-5284 (Friedland)
(202) 551-3992 (Wasserman)
Email: TimmerJ@SEC.gov
Email: BallDan@SEC.gov
Email: FrieldandRa@SEC.gov
Email: WassermanE@SEC.gov

*Attorneys for the Plaintiff*